UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

KAI GREENE,

              Plaintiff,                               FIRST AMENDED COMPLAINT

        v.                                    DOCKET NUMBER 19-CV-11890

BRIGHTPOINT CARE, INC., and SUN          JURY TRIAL DEMANDED
RIVER HEALTH f/k/a HUDSON
RIVER HEALTHCARE, INC.,

              Defendants.

_____ x

## COMPLAINT AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1.    This is a civil action by KAI GREENE ("GREENE"), on her own behalf against defendants BRIGHTPOINT CARE, INC. and S U N   R I V E R   H E A L T H  f/k/a HUDSON RIVER HEALTHCARE, INC. (collectively, "BRIGHTPOINT") under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA") and the New York State False Claims Act, N.Y. State Finance Law§§ 187 et seq. ("NYSFCA"), for treble damages, civil penalties, and other relief arising from BRIGHTPOINT's improper claims for, and receipt and retention of, monetary payments from the United States and the State of New York.

2.    Specifically, BRIGHTPOINT operates a network of medical clinics, designated as Federally Qualified Health Centers ("FQHCs"), in the boroughs of the Bronx, Queens and Brooklyn.  FQHCs are community-based centers that provide a range of medical services. BRIGHTPOINT's clinics serve predominantly recipients of Medicaid benefits.

3.    As set forth in greater detail herein, BRIGHTPOINT intentionally defrauded the Medicare and Medicaid programs by, among other things, BRIGHTPOINT unlawfully submitted

claims to the Government for services that were never provided or not medically necessary. These claims included requests for payment for (1) per-member-per-month and per-patient enrollment fees associated with "phantom patients"; (2) clients ineligible for the Health Home Program; and (3) medically unnecessary services, including (a) unnecessary visits generated via cold calling; (b) unnecessary clinic visits generated via improper patient solicitation; (c) services utilized by patients as a result of improper gratuities; (d) unnecessary follow-up visits; (e) services for which staff were not trained; (f) in-person visits conducted over the phone; and (g) services that were billed for, but never provided whatsoever. Additionally, BRIGHTPOINT fraudulently procured PPS payments in excess of that to which it was entitled by, among other things, improperly reporting expenses putatively incurred by the FQHCs, including, but not limited to, improperly charging business developments expenses to the FQHCs.

## II. PARTIES AND ENTITIES

5. Greene is a natural person who currently resides in the State of New York. At times relevant to this complaint, Greene was an employee of BRIGHTPOINT.

6. Brightpoint Health is a not-for profit corporation organized under the laws of the State of New York, with its principal offices at 71 West 23rd Street, 8th Floor, New York, New York. Brightpoint Health operates freestanding diagnostic and treatment centers licensed under Article 28 of the New York State Public Health Law and Article 31 of the New York State Mental Hygiene Law. Brightpoint Health operates thirteen clinics, designated as Federally Qualified Health Centers ("FQHCs"), throughout the boroughs of the Bronx, Queens and Brooklyn. The clinics offer primary care, behavioral health and social services.

7. Brightpoint Care, Inc. ("Brightpoint Care") is a not-for profit corporation organized

under the laws of the State of New York, with its principal offices at 71 West 23rd Street, 8th Floor, New York, New York. BRIGHTPOINT CARE provides adult day health care and mental health home programs. It participates in the Medicaid Health Home Program, in which comprehensive care management, transitional care and family and patient support services are provided. Upon information and belief, Brightpoint Health and BRIGHTPOINT CARE are under common management and control, and Brightpoint Health is the sole member of BRIGHTPOINT CARE.

8.   Sun River Health f/k/a Hudson River Healthcare, Inc. ("HRH") provides care management services at 1037 Main Street, Peekskill, New York. HRH operates thirty clinics, designated as FQHCs, throughout the Hudson Valley and Suffolk County, New York.

9.   On December 13, 2018, Brightpoint Health and HRH announced final regulatory approval for a merger of the two systems. Upon information and belief, the two systems are under common management and control. Upon information and belief, HRH bears successor liability for any acts of Brightpoint Health prior to and after the merger.

10.   BRIGHTPOINT at all relevant times held multiple NPI numbers.[1]

## III.   JURISDICTION AND VENUE

11.   The court has subject matter jurisdiction over the FCA claims alleged in this complaint under 28 U.S.C. §§ 1331 (federal question) and 31 U.S.C. § 3732(a) (False Claims Act).

12.   The court has personal jurisdiction over each Defendant pursuant to 31 U.S.C. § 3732(a) because each entity can be found, resides, or transacts business in this district. Section

---

[1] NPI refers to Net Provider Identifier, a unique ten-digit code assigned by the National Plan and Provider Enumeration System to health care providers. Providers who enroll in Medicaid/Medicare must obtain an NPI and utilize it in all standard transactions.

3732(a) further provides for service of process at any place within or outside the United States.

13.     Jurisdiction over the state law claims arises under 31 U.S.C. § 3732(b) (jurisdiction over state claims arising from the same transaction or occurrence as an action under the federal FCA) and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

14.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because each Defendant can be found, resides, and transacts business in this district; an act proscribed by 31 U.S.C. § 3729 occurred within this district; and a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this district.

## IV.     FCA SUBJECT MATTER JURISDICTION

15.     Upon information and belief, none of the subject matter or other jurisdictional bars set forth in the FCA is applicable to this action.

16.     Upon information and belief, prior to any "public disclosure" (as defined by the FCA and the NYSFCA), GREENE voluntarily disclosed to the United States Attorney's Office for the Southern District of New York and the office of the Attorney General of the State of New York the information upon which the allegations or transactions in this complaint are based.

17.     Through her employment at BRIGHTPOINT, Greene is an "original source" of the information on which her allegations are based, within the meaning of the FCA and the NYSFCA.

## V.     APPLICABLE LAW

### A.     FCA and NYSFCA Damages, Penalties, and Awards for False Claims

18.     The FCA imposes liability on any person violating § 3729(a)(1) to the United States Government as follows: a civil penalty of not less than $5,500 and not more than $11,000, as

adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410), plus three (3) times the amount of damages which the Government sustained because of the act of that person. 31 U.S.C. § 3729(a)(1).

19.     The NYSFCA, effective as of August 27, 2010, imposes civil liability on "any person" who, among other things:

(a)     knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(b)     knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(c)     knowingly makes, uses or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government; or

(d)     knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government or conspires to do the same. N.Y. State Fin. Law §§ 189(1)(a), (b), (g) and (h).

20.     The NYSFCA imposes liability on any person violating Section 189 to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the fact of that person. N.Y. State Fin. Law § 189.

**B.     Relevant FCA and NYSFCA Definitions**

21.     For purposes of the FCA, "claim" means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that  (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United

States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2)(A).

22.     For purposes of the NYSFCA, "claim" means any request or demand, whether under a contract or otherwise for money or property that (i) is presented to an officer, employee or agent of the state or a local government; or (ii) i s made to a contractor, grantee, other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. N.Y. State Fin. Law § 188(1)(a).

23.     For purposes of the FCA and the NYSFCA, "knowing" and "knowingly" means that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.31 U.S.C. § 3729(b); N.Y. State Fin. Law § 188(3)(a).

24.     For purposes of the FCA and the NYSCA, "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3); N.Y. State Fin. Law § 188(4).

25.     For purposes of the FCA and the NYSFCA, "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4); N.Y. State Fin. Law § 188(5).

**C.  The Medicare Program**

26.      Medicare, enacted in 1965 under Title XVIII of the Social Security Act [42 U.S.C. §§ 1395 et seq.], is a third party reimbursement program that underwrites the medical expenses of qualified elderly and the disabled persons (i.e., Medicare "Beneficiaries"). Medicare reimbursements are paid from CMS, through intermediaries, such as private insurers, to participating healthcare providers (i.e., Medicare "Providers"). Medicare reimbursements to Providers are paid from the Federal Hospital Insurance Trust Fund and/or the Federal Supplementary Medical Insurance Trust Fund depending on the type of healthcare services or goods being reimbursed (e.g., hospitalization, physician care or drugs).

27.      Medicare is comprised of four distinct parts, designated as Parts A through D. Medicare Part A (Hospital/Hospice Insurance) covers in-patient hospital services. Medicare Part B (Medical Insurance) covers physician services, including medical and surgical treatment and outpatient treatment and diagnosis, as well as a variety of healthcare related supplies and durable medical equipment. Part C (Medicare Advantage Plans) covers managed health care preferred provider organizations ("PPOs") or health maintenance organizations ("HMOs") that serve as substitutes for original Medicare Parts A and B benefits. And, Medicare Part D (Prescription Drug Plans) covers part of the cost of prescription drugs and prescription drug insurance premiums.

28.      The FCA Medicare qui tam claims at issue related to this action arise under Medicare Part B.

**D.  The Medicaid Program**

29.      Medicaid, enacted in 1965 under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., is a medical assistance program for indigent and other needy people that is financed by joint federal and state funding and is administered by the states according to federal regulations,

oversight, and enforcement. Each state implements its version of Medicaid according to a State Plan that has been approved by HHS. Within broad federal regulatory and policy guidelines (see 42 C.F.R. § 430 et seq., and CMS publications), the states determine who is Medicaid-eligible, what services are covered, and how much to reimburse healthcare providers. The states, through intermediaries, also receive healthcare provider claims for program reimbursements, evaluate those claims, make payments to the healthcare providers, and present the claims to HHS/CMS for reimbursement of the federal government's share.

30.     New York's Medicaid Program was established in 1966. Act of Apr. 30, 1966, ch. 256, 1966 N.Y. Laws 844. By statute, NYDOH administers this program at the state level. N.Y. Pub. Health Law § 201(1)(v). The NYSFCA claims at issue in this case arise under the New York Medicaid program.

31.     Together with the State of New York and the City of New York, HHS jointly funds the Medicaid Program covering New York City beneficiaries and providers.

32.     NYDOH is responsible for administering the New York Medicaid Program. NYDOH does this through its Office of Health Insurance Programs, located at Corning Tower, Empire State Plaza, Albany, NY 12237. New York Medicaid claims are processed through the New York State Medicaid Management Information System ("MMIS"), currently also referred to as "eMedNY."

33.     Upon information and belief, including based upon its website, at all relevant times, Computer Sciences Corporation ("CSC") was a private internet technology contractor that, on behalf of NYDOH, processed New York Medicaid claims submitted to MMIS/eMedNY by healthcare providers in New York State, including the Defendants. CSC processes New York Medicaid claims at offices located at 327 Columbia Turnpike, Rensselaer, New York 12144.

**E.**     **Federally Qualified Health Centers ("FQHCs")**

34.     FQHCs are community-based health care providers that provide primary care services in underserved areas.  They are defined in Section 1861(a)(a) of the Social Security Act, 42 U.S.C. § 1395(a)(a).  The Health Resources & Services Administration ("HRSA") of the United Stated Department of Health and Human Services is responsible for certifying providers as FQHCs, which must meet a number of strict eligibility requirements.

35.     FQHCs are permitted to set a fee schedule for services that they provide, but they must do so on a sliding scale based on patients' ability to pay.

36.     FQHCs may also seek reimbursement for services from Medicare and Medicaid.  As described more fully below, beginning October 1, 2014, FQHCs have been reimbursed based upon a Prospective Payment System (PPS).

37.     In addition, FQHCs may apply for grant funding issued by the HRSA pursuant to Section 330 of the Public Health Act ("Section 330 Grants").  Section 330 Grants are intended to defray the costs of providing services to the uninsured.

**F.**     **The Health Home Program**

38.     The Affordable Care Act of 2010, created the Medicaid Health Home Services program.  Such Health Home Services are to be provided to Medicaid recipients with chronic conditions.

39.     The Health Home Program was created for the purpose of getting particularly vulnerable Medicaid patients regular care and services from doctors and providers, helping them find a safe place to live, and assisting them in securing medical appointments.  Achieving these goals should, in turn, prevent costly trips to the emergency room and hospitals.

40.     A "Health Home" is not a physical place; it is a group of health care and service

providers working together to make sure patients get the care and services they need to stay healthy.

41.     Agencies providing Health Home Services assign case workers to patients.  The case workers are to meet and work with patients with a view to coordinating care and reducing a patient's likelihood of using emergency room or similar services.

42.     Agencies providing Health Home Services receive Medicaid funding.

43.     Agencies providing Health Home Services receive a per-member-per-month (PMPM) fee.  In order to be earn a PMPM fee, a Health Home must provide at least one of the core Health Home services in a given month.  The monthly payment are paid through the outreach and engagement PMPM.

44.     Once a member has been assigned a care manager and is enrolled in the Health Home program the active care management PMPM may be billed.

45.     In addition, agencies also receive a per-patient enrollment fee for a period of three months to cover outreach efforts.

46.     Patients eligible for Health Home Services include Medicaid recipients who (i) have two or more chronic conditions (including mental health, substance abuse, asthma, diabetes, heart disease and being overweight, with other conditions such as HIV / AIDS subject to CMS approval); (ii) have one chronic condition and are at risk for a second; or (iii) have one serious and persistent mental health condition.

47.     Among other things, providers must provide for comprehensive care management that includes a comprehensive assessment identifying the medical, behavioral health and social service needs and a plan of care. Other elements of services include, among other things, care coordination and health promotion, comprehensive transition care, enrollee and family support, referral to community and social supports and use of Health Information Technology to link

services.

48.     Upon information and belief, BRIGHTPOINT serves as a partner associated with one or more certified Health Home Care providers.

**G.     The Anti-Kickback and Civil Monetary Statutes**

49.     The Social Security Act's anti-kickback statute, Title 42, United States Code, Section, 1320a–7b ("AKS"), makes it a criminal offense to, among other things, knowingly offer, give, solicit or receive "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" in exchange for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b.

50.     Section 6402(f) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Program Integrity Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010) ("PPACA"), amended 42 U.S.C. § 1320a–7(b) provides that, in addition to violating criminal law provisions under the Social Security Act, submitting claims for reimbursement to government health insurance programs that, among other things, include items or services resulting from a violation of Social Security Act's anti-kickback provisions also constitute "false or fraudulent claims" under the FCA. 42 U.S.C. § 1320a-7b(g). Section 6402(f) of the PPACA further provides that such violations do not require actual knowledge of the Social Security Act's anti-kickback statute or specific intent to violate it. 42 U.S.C. § 1320a-7b(h). By operation of the above, depending on which program is implicated, submitting or causing the submission of claims resulting from anti-kickback violations to Medicare or IL Medicaid violates the FCA and/or ILFCA. *See* 31 U.S.C. § 3729(a)(1)(A) and 740 ILCS 175 § 3(a)(1)(A), respectively.

51.     Another component of the AKS, known as the Civil Monetary Penalties Statute ("CMP"), subject to certain exceptions, prohibits the submission of a claim for payment by anyone who knowingly

> offers to or transfers remuneration to any individual eligible for benefits under [a Federal health care program] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under [a Federal health care program]. 42 U.S.C. § 1320a-7a(a)(5).

52.     "Remuneration" under the CMP "includes the waiver of coinsurance and deductible amounts (or any part thereof), and transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).

## H.     Wrongful Retention

53.     Failure to return to the federal government any overpayment received from either Medicare or Medicaid Programs constitutes a reverse false claim actionable under Section 3729(a)(1)(G) of the current version of the FCA and Section 3729(a)(7) of the prior version of the FCA.  The United States is entitled to recover three times the amount of each overpayment and, for each claim or overpayment, a civil penalty of not less than $5,500 and not more than $11,000.

54.     Failure to return to the New York State government any overpayment received from the New York Medicaid Program also constitutes a reverse false claim actionable under Section 189(1)(g) and (h) of the current version of the NYSFCA and Section 189(1)(g) of the prior version of the NYSFCA.  The State of New York is entitled to recover three times the amount of each overpayment and, for each claim or overpayment, a civil penalty of not less than $6,000 and not more than $12,000.

## I.     Billing, Claims and Record-Keeping Regulations

55.     Claims for medical services are submitted by hospitals, individual practitioners and

medical group practices to HHS using the electronic equivalent of CMS Form 1500.

56.     CMS Forms UB-04 and 1500 require the persons and/or entities submitting them to government insurance programs to truthfully and accurately list, among other things, the identity of the practitioner who "personally" rendered the claimed service. This is usually accomplished by citing the rendering practitioner's name and his or her government insurance program provider number (typically, a National Provider Identifier or "NPI"). See, e.g., CMS Form 1500, field J.

57.     At all times relevant to this complaint, the CMS Form UB-04 contained the following notices or ones substantially similar to them:

> UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).
>
> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts….
>
> ***
>
> For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

58.     At all times relevant to this complaint, the CMS Form 1500 contained the following notices or ones substantially similar to them:

> NOT1CE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.
>
> ***
>
> SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)
>
> In submitting this claim for payment from federal funds, I certify that: 1) the

information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) *this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal Anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)*; 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section.

For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

MEDICAID PAYMENTS (PROVIDER CERT1FICATION)…SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and the health of this patient and *were personally furnished by me or my employee under my personal direction*.

Emphasis Supplied.

59.     Submitting or causing the submission of either a CMS Form UB-04 or CMS Form 1500 to Medicare or NY Medicaid where a claim includes items or services resulting from a violation of the AKS and/or of the CMP is actionable under the FCA and/or NYSFCA.

## VI.     FACTUAL ALLEGATIONS

### A.     Background

60.     In or around 2009, Paul Vitale was hired as the chief executive of HELP/PSI, Inc. ("HELP/PSI"). Upon information and belief, Vitale had been the administrator of an FQHC in

Massachusetts.

61.     HELP / PSI operated adult day health centers that included drug treatment and primary care clinics as well as the existing Nursing Home.

62.     Under Paul Vitale's direction, the primary care clinics were moved to HELP PSI Services Corp. ("Services Corp.") from HELP / PSI, which retained the adult day health centers and the Nursing Home.  Later, HELP / PSI sold the beds and operations associated with the Nursing Home.

63.     Also under Paul Vitale's direction, HELP / PSI formed a Health Home Program pursuant to the Affordable Care Act (discussed more fully below).

64.     HELP / PSI eventually changed its name to BRIGHTPOINT CARE, and Services Corp. changed its name to BRIGHTPOINT HEALTH.

65.     Vitale also directed that a business development group ("Business Development Group") be created within BRIGHTPOINT.  The Business Development Group consisted of teams aimed at identifying new potential clients of BRIGHTPOINT.

66.     Personnel in the Business Development Group were provided incentive compensation for clients who were brought in to BRIGHTPOINT.

67.     At Vitale's direction, BRIGHTPOINT engaged in fraudulent practices to obtain improper reimbursements from Medicare and Medicaid.

68.     BRIGHTPOINT'S procurement of excessive reimbursements and improper payments allowed Paul Vitale to cause the entity to engage in reckless, lavish spending.  Among other things, Vitale authorized (i) company vehicles for himself and other BRIGHTPOINT personnel; (ii) excessive expenditures on office furnishings; (iii) lavish parties, including at least one social event that included a 'cash wheel'; (iv) excessive travel expenses; and (v) numerous

other excessive expenses.

69.     Paul Vitale also caused BRIGHTPOINT to increase his compensation several fold compared to his compensation when he was hired.

70.     In addition, Vitale procured additional benefits from the fraud by causing BRIGHTPOINT's excessive spending to be charged to the entity's American Express cards, and then using the points from such charges for his own benefit.

71.     GREENE joined BRIGHTPOINT HEALTH in or around December 2018 as a Care Manager at the BRIGHTPOINT clinic on Church Avenue in Brooklyn, New York. She reported directly to the Charlene Vernon, a Care Management Unit Supervisor.  In May 2019, she was terminated.

72.     As a Care Manager, GREENE was responsible for interfacing with clients, assessing their healthcare needs, and coordinating their treatment with service providers. In her role, GREENE became aware of BRIGHTPOINT'S efforts to increase revenue through improper means.

73.     GREENE and the other 30 care managers at the Church Avenue (Brooklyn) BRIGHTPOINT facility were each responsible for 40 to 50 clients—nearly all of whom were Medicaid enrollees.

74.     While at BRIGHTPOINT, superiors directed GREENE and her colleagues to maintain unreasonably high patient-engagement rates.  Specifically, GREENE'S supervisors pressured her to submit claims for reimbursement for at least 95% of her clients each month to maximize revenues for each monthly billing cycle.

75.     Likewise, BRIGHPOINT paid its intake workers—who were responsible for outreach and enrollment of clients—on a wholly commission basis.

76.     The unreasonable expectations set for GREENE and her co-workers created perverse incentives and encouraged the commission of unethical and illegal practices to obtain improper reimbursements from Medicare and Medicaid.

B.     **Submission of False Claims for Government Reimbursement**

77.     Medicare and Medicaid provide for reimbursement only for medical visits that are medically necessary.

78.     BRIGHTPOINT unlawfully submitted claims to the Government for services that were never provided or not medically necessary.  These claims included requests for payment for (1) per-member-per-month and per-patient enrollment fees associated with "phantom patients"; (2) clients ineligible for the Health Home Program; and (3) medically unnecessary services, including (a) unnecessary visits generated via cold calling; (b) unnecessary clinic visits generated via improper patient solicitation; (c) services utilized by patients as a result of improper gratuities; (d) unnecessary follow-up visits; (e) services for which staff were not trained; (f) in-person visits conducted over the phone; and (g) services that were billed for, but never provided whatsoever. Additionally, BRIGHTPOINT fraudulently procured PPS payments in excess of that to which it was entitled by, among other things, improperly reporting expenses putatively incurred by the FQHCs, including, but not limited to, improperly charging business developments expenses to the FQHCs.

1.     **"Phantom Patients"**

79.     Upon information and belief, BRIGHTPOINT's Health Home Program was yielding a profit margin in excess of 50%.  The director of the program said that the program lacked the required staffing and that providers had several times more patients than they should have had. She explained that thousands of patients were in 'outreach' status, and that she did not have

anywhere near enough staff to make outreach efforts (such as calls, letters, field visits). BRIGHTPOINT was therefore failing to fulfill the purpose of the program, namely, to facilitate linkage to comprehensive care across the healthcare spectrum.

80. After an audit found that BRIGHTPOINT was not providing the services required by the Health Home Program, BRIGHTPOINT stopped taking new patients into the program for a period of time.

81. Shortly thereafter, however, BRIGHTPOINT began taking into the Health Home Program patients who were not eligible for the program.

82. Upon information and belief, BRIGHTPOINT falsely represented that the patients were eligible for Health Home Program in Medicare and Medicaid billing, and falsely represented that it was providing the required services under the Health Home Program, when in fact it had not, thereby fraudulently procuring payments under the Health Home Program.

83. As part of its business development practices, BRIGHTPOINT intake workers obtained information for "potential clients" from registers obtained from neighborhood churches and other sources. BRIGHTPOINT often acquired this information without securing consent from or even providing notice to such individuals.

84. BRIGHTPOINT also induced other individuals, often residing in shelters, to provide their personal information on the pretense that BRIGHTPOINT would secure them housing—which is in high demand in the New York metropolitan area. BRIGHTPOINT not only lacked any special ability to procure housing for its "potential clients," it made no effort to do so after they agreed to provide their information on this false pretext.

85. Once BRIGHTPOINT secured this information, intake workers would then set up appointments for these "phantom patients" without those individuals even knowing that such

appointments had even been made.

86.     Naturally, the "phantom patients" typically did not show for the "appointments" scheduled, as they often had no idea that they had been scheduled for them in the first place.

87.     Likewise, BRIGHTPOINT improperly inflates their patient population number by knowingly refraining from closing out former clients that no longer received treatment via BRIGHTPOINT or otherwise sought to be disenrolled from the Health Home Program.

88.     BRIGHTPOINT's enrollment of and/or refusal to unenroll these "phantom patients" in the Health Home Program provided it with fraudulent bases to submit false claims for payment of per-member-per-month and per-patient enrollment fees.

89.     Upon starting at BRIGHTPOINT, GREENE was transferred many "phantom patients" who had not been properly engaged or disenrolled from the Program.

90.     Across the entirety of the Church Avenue (Brooklyn) facility's patient population, GREENE estimates that roughly 1/3 are "phantom patients."

91.     For example, in January 2019, GREENE was transferred a Health Home client, M.M., by Unit Supervisor Sonia Patrice. On March 6, 2019, however, GREENE received a voicemail from M.M.'s social worker, informing GREENE that M.M. no longer wanted to be in the Home Health Program but had never been disenrolled.

92.     Likewise, GREENE spoke to another client, R.V., who wished to be to be disenrolled from the Health Home Program.  R.V. was on probation and initially registered for BRIGHTPOINT's Health Home Program because BRIGHTPOINT falsely represented that it could assist in securing housing upon enrollment.  BRIGHTPOINT did not make any effort to secure housing for R.V., let alone provide any kind of special access to such housing that BRIGHTPOINT claimed to have.

93.     GREENE also talked to H.B., a client who informed GREENE of a desire to be disenrolled from the Health Home Program. H.B. does not attend services at BRIGHTPOINT and, upon information and belief, was signed up for the Health Homes Program without consent. Nevertheless, GREENE learned that Unit Supervisors— with the direction of the Program Manager—decided to keep H.B.'s client file open.

94.     Similarly, GREENE was transferred a Home Health Client, M.M. #2 (different from the above-mentioned M.M.), by Unit Supervisor Charlene Vernon. When GREENE spoke with M.M. #2, she learned that the client had never met with anyone from BRIGHTPOINT'S Home Health Program, despite having been assigned a Health Home Program case manager prior to GREENE.

95.     On April 19, 2019, GREENE emailed Regional Program Director Jainool Ramjohn, stating that on March 28, 2019, GREEN informed Ms. Vernon that M.M. #2 had never met with anyone from BRIGHTPOINT's Home Health Program.

### 2.     Clients Ineligible for the Health Home Program

96.     As stated above, to be eligible for Health Home Services, patients must be Medicaid recipients who (i) have two or more chronic conditions (including mental health, substance abuse, asthma, diabetes, heart disease and being overweight, with other conditions such as HIV / AIDS subject to CMS approval); (ii) have one chronic condition and are at risk for a second; or (iii) have one serious and persistent mental health condition.

97.     Vitale instructed BRIGHTPOINT staff to enroll patients in the Health Home Program, whether they were in need of the services or not. In one instance, Vitale instructed the staff at the Church Avenue clinic to enroll every Medicaid patient in the Health Home Program. He instructed staff to 'find' a diagnosis that would make it appear that the patients were eligible, such as 'dementia / Alzheimer's or HIV+. As a result, patients were enrolled on the basis of

conditions that they in fact did not have.

98.     For example, GREENE spoke with a client, T.H., who acknowledged not having any medical or behavioral health issues that would qualify T.H. for the Health Home Program—despite such qualifying conditions being listed on T.H.'s intake form.

99.     GREENE raised her concerns about T.H. in an email to Unit Supervisor Charlene Vernon, on which Mr. Ramjohn was cced, on January 29, 2019, stating that T.H. had no qualifying conditions.  But, rather than address the issue appropriately, Ms. Vernon simply directed GREENE to bill for "Health Home services" provided to T.H. anyway.

100.     To date, T.H. remains on the Health Home caseload as a client, despite GREENE's best efforts to have T.H. removed.

101.     In addition, GREENE encountered clients at BRIGHTPOINT who were ineligible for the Health Home Program because they were incarcerated or in a separate rehabilitation program.  Medicaid does not pay for medical care while an enrollee is in prison or jail.  And while Medicaid does pay for enrollees receiving treatment in rehabilitation, BRIGHTPOINT cannot separately bill for such services on behalf of those individuals—as doing so would constitute double dipping.

102.     On December 20, 2018, GREENE emailed Unit Supervisor Sonia Patrice identifying a Health Home client, C.T., that remained in the Program despite being incarcerated.

103.     In fact, in February 2019, GREENE identified several incarcerated clients still in BRIGHTPOINT'S Health Home Program.  GREENE put together a list of these clients and sent it to Regional Program Director Jainool Ramjohn by way of email on February 8, 2019.

104.     Later that month, on February 25, 2019, GREENE sent an email to Unit Supervisor Charlene Vernon in which GREENE specifically identified two Health Home clients, C.T. and

T.H. #2 (different from the above-mentioned T.H.), that remained in the Program despite being incarcerated since December 2018.

105.    On March 5, 2019, following a supervision meeting between GREENE and Unit Supervisor Luis Herrera, Mr. Herrera emailed Regional Program Director Jainool Ramjohn, ccing GREENE, regarding clients identified by GREENE as ineligible for the Home Health Program. This email stated that T.H. #2 remained in the Program despite being incarcerated since December 2018, C.T. remained in the Program despite being incarcerated since December 2018, C.A. remained in the Program despite being enrolled in an inpatient rehabilitation program, J.B. remained in the program despite only seeking housing, the intake form for client T.C. listed conditions that were inaccurate and the client did not actually qualify for home health services.

106.    Similarly, GREENE spoke with the emergency contact for one client, K.G., who resided in a nursing home.  Despite K.G.'s treatment in that facility, BRIGHTPOINT never dis-enrolled K.G. from its Home Health Program.

### 3.    Services That were Medically Unnecessary or Never Provided

107.    Unlike most other Health Home Service providers, BRIGHTPOINT itself employs medical staff and offers clinical treatment options in conjunction with its care management program.

108.    While at BRIGHTPOINT, GREENE was directed to refer all BRIGHTPOINT clients to in-house BRIGHTPOINT providers for treatment to further increase revenues beyond per-member-per-month and per-patient enrollment fees.

109.    Many of the services provided by BRIGHTPOINT, however, were unreasonable, unnecessary, or never provided.

### a.    Cold Calling to Generate Unnecessary Visits

110.     Vitale periodically directed managers to instruct staff to make 'cold calls' to patients who had had not received any services in the preceding six months and to schedule them for office visits.

111.     At Vitale's directive, BRIGHTPOINT's front-office and clinic staff would call patients who had not had office visits in the preceding six months and said, in substance, that they had not been in for a visit for some time and should come in for an office visit, without regard to any medical necessity for the visit.  These calls were only made, at Vitale's direction, to the Medicaid patients, given BRIGHTPOINT's high Medicaid reimbursement rates as an FQHC.

112.     As a result of the cold calls, patients scheduled, and BRIGHTPOINT billed Medicaid and Medicare for, office visits that were not medically necessary.

113.     Also at Vitale's directive, BRIGHTPOINT sent personnel to various homeless shelters, treatment, and other facilities to induce, and in some instances to instruct, patients to visit a clinic for office visits that were not medically necessary.

114.     BRIGHTPOINT also induced Patients to visit their clinics unnecessarily.  For example, BRIGHTPOINT personnel would visit a homeless shelter in the morning after breakfast and instruct the residents that they needed to visit a clinic. BRIGHTPOINT then provided bus transportation to a BRIGHTPOINT clinic. (As noted below, the patients were also induced with free items.) Shelter residents were promised a more pleasant environment with amenities such as snacks, coffee and televisions.  In many instances, patients could spend the day at the clinic, with the use of the clinic's amenities.

115.     As a result of these instructions, patients from the various facilities travelled to BRIGHTPOINT clinics for office visits that were medically unnecessary, and for which BRIGHTPOINT billed and received Medicare and Medicaid reimbursement.  Doctors and medical

assistants argued about how to document such patients' 'chief complaint' in the medical records, as the patients had to need to see a doctor. In some instances, medical assistants would not even identify a reason.

### b. Providing Improper Gratuities to Induce Patients to Utilize Services

116. As a further means of inducing patients to utilize BRIGHTPOINT's services at the FQHCs and to generate more improper billing, and also at Vitale's direction, BRIGHTPOINT provided gratuities to patients in excess of the *de minimis* gratuities permitted by applicable Medicare and Medicaid rules.

117. The excessive gratuities included, among other things, (i) free transportation to the clinics, (ii) gift cards and metro cards to patients who had already had transportation; and (iii) free meals.

118. These gratuities were provided to induce patients to visit the clinics and receive services, for which BRIGHTPOINT received improper reimbursements.

### c. Billing for Unnecessary Follow-up Visits

119. Also at Vitale's direction, BRIGHTPOINT implemented a practice of requiring patients to schedule follow-up visits that were medically unnecessary.

120. For example, BRIGHTPOINT would require patients to schedule a visit simply to receive the results of tests that had been ordered on a prior visit, even though the test results could have been conveyed over the telephone and otherwise did not require an office visit.

121. As a result, BRIGHTPOINT caused to be submitted Medicare and Medicaid claims for such medically unnecessary visits.

### d. Billing for Services for which Staff were Not Trained

122. BRIGHTPOINT Care Managers were also directed to provide intensive services

that they were never trained to provide.

123.     In March 2019, GREENE was directed to provide critical mental health counseling services to two clients, P.Y. and P.G., for which she did not have training.  These two individuals were Health and Recovery Plan (HARP) clients that required treatment by HARP social workers.

124.     GREENE was also directed to bill for these more intensive, more expensive services—despite not being qualified to provide them—and allow BRIGHTPOINT to receive improper reimbursement for same.

### e.     Billing for In-Person Visits Conducted over the Phone

125.     BRIGHTPOINT also manufactured improper claims by billing telephone calls with clients as if they were visits conducted in-person.

126.     GREENE was specifically directed by her superiors to bill Medicaid for in-person patient visits when those contacts occurred telephonically.

127.     This was done for the sole purpose of providing a core Health Home service (the in-person, rather than over the phone, visit) in a given month, without actually having to provide that service—thereby leading to claims for reimbursement for services never rendered.

128.     For example, on March 28, 2019, GREENE approached Unit Supervisor, Luis Herrera, with concerns about the participation (or lack thereof) of a client, M.M. #2, in BRIGHTPOINT.

129.      In an effort to demonstrate that M.M. #2 utilized BRIGHTPOINT's services, Mr. Herrera provided GREENE with a printout of M.M. #2's labs.  GREENE then asked if a client's meeting with a doctor to go over labs would constitute a "core service" that would allow BRIGHTPOINT to bill a PMPM fee for M.M. #2 for that month.  In response, Mr. Herrera stated that "you can take the labs and say that you went over them with her in-person . . . . Don't tell

anyone that I told you that."

**f.      Failing to Provide Billed-For Services Entirely**

130.    BRIGHTPOINT staff also billed for services that were never provided.

131.    After being wrongfully terminated by BRIGHTPOINT on May 23, 2019, which is explained in greater detail below, GREENE obtained work as a *per diem* employee for a nonprofit community health organization where she is a residential social work staff member providing services to high-need clients.

132.    In this capacity, GREENE provided services to a client, R.P., in an adult care center whose care is being coordinated by BRIGHTPOINT.

133.    Despite being required to do so, BRIGHTPOINT failed to coordinate or provide the necessary transportation for R.P. from provider care visits as recent as September 2019.

**4.      Overstatement of Expenses and Excessive Reimbursement Rates**

134.    Under the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 and Section 1902(bb) of the Social Security Act, FQHCs are entitled to reimbursement for covered services to Medicaid patients under a Prospective Payment System ("PPS") methodology.

135.    The PPS is intended to ensure that FQHCs receive reimbursement equal to what would be provided under Medicaid in the instance when a Medicaid managed care organization ("MCO") provides a lower reimbursement rate.

136.    As such, state Medicaid programs are required to make supplemental payments to FQHCs ("Supplemental Payments").  The Supplemental Payments are calculated based upon a particular facility's expenses and utilization.

137.    Specifically, in New York, an FQHC submits to the DOH an annual Managed Care

Visit and Revenue ("MCVR") report. The FQHC must identify the number of visit per MCO within the preceding year, as well as the average reimbursement provided by the corresponding MCO. The data is utilized to calculate an average MCO payment that the FQHC received.

138. The average MCO payment is then compared to the FQHC's blended Medicaid rate for the period. The Medicaid blended rate, in turn, is the weighted average of the PPS rate code 4013, and the e-MedNY fee-for-service rate codes 4011 and 4012.

139. The difference between the average MCO payment and the Medicaid blended rate constitutes the amount of the Supplemental Payment by New York State to the FQHC with regard to the payments from the corresponding MCOs.

140. An FQHC obtains the Supplemental Payments from New York by submitting claims to eMedNY. An FQHC can only receive a Supplemental Payment for a visit for which an MCO paid the underlying claim, as well as several other prerequisites for receipt of a Supplemental Payment.

141. MVCRs are submitted on an annual basis, based on a rate period of October 1 through September 30. For example, the MCVR for calendar year 2016 was due July 10, 2017 and governed the calculation of Supplemental Payments for the period from October 1, 2017 through September 30, 2018.

142. The MVCR requires the FQHC's chief executive officer to attest to the accuracy of the information in the report, as follows:

> The undersigned hereby certifies that to the best of my informed knowledge and belief the statements made herein and the documents attached hereto are accurate, true and complete in all material respects. I understand that the New York State Department of Health is relying upon this certification as part of its review and approval process, and that should it be determined that this certification is materially false or incomplete or incorrect or includes incorrect, false or misleading information, appropriate enforcement

action will be taken.

143.     Under the PPS methodology, reimbursement rates are based on a particular facility's expenses and utilization.

144.     In practice, the PPS payments typically result in reimbursements to the FQHC in excess of the standard Medicaid rates.

145.     The Act further permits states to enact an Alternative Payment Methodology ("APM") as an alternative to the PPS methodology, so long as the APM provides at least the minimum level of payment as required under the PPS.  An FQHC must opt-in to a state's APM. Upon information and belief, BRIGHTPOINT has not opted-in to New York State's APM.

146.     Upon information and belief, BRIGHTPOINT fraudulently procured PPS payments in excess of that to which it was entitled by, among other things, improperly reporting expenses putatively incurred by the FQHCs, including, but not limited to, improperly charging business developments expenses to the FQHCs.

C.     **Retaliation**

147.     In March 2019, GREENE informed Unit Supervisor Luis Herrera that GREENE had identified certain clients as ineligible for the Home Health Program. On March 5, 2019, Mr. Herrera emailed Regional Program Director Jainool Ramjohn, ccing GREENE, regarding the clients identified by GREENE as ineligible for the Home Health Program.

148.     This email stated that GREEN had identified that T.H. #2 remained in the Program despite being incarcerated since December 2018.

149.     C.T. remained in the Program despite being incarcerated since December 2018.

150.     C.A. remained in the Program despite being enrolled in an inpatient rehabilitation program.

151. J.B. remained in the program despite only seeking housing, the intake form for client T.C. listed conditions that were inaccurate and the client did not actually qualify for home health services.

152. On March 22, 2019, GREENE sent Unit Supervisor Charlene Vernon an email, stating that clients P.Y. and P.G. required "a higher level of services" due to their need for mental health counseling services and noting that P.Y. was a Health and Recovery Plan (HARP) client.

153. On April 19, 2019, GREENE sent Regional Program Director Jainool Ramjohn an email concerning many of the issues detailed above and identifying a number of BRIGHTPOINT employees engaged in unethical and illegal conduct.

154. GREENE's email stated that on March 28, 2019, GREENE instructed Unit Supervisor Charlene Vernon that a client, M.M. #2, had stated that she had never met anyone from BRIGHTPOINT'S Health Home Program, and that in March 2019, GREENE asked Unit Supervisor Luis Herrera to confirm a client's participation at BRIGHTPOINT, Mr. Herrera provided GREENE with a printout of the client's labs, GREENE asked if a client's meeting with a doctor to go over labs would constitute a "core service" that would allow BRIGHTPOINT to bill a fee for the client for that month, and in response, Mr. Herrera stated that "you can take the labs and say that you went over them with her in-person . . . . Don't tell anyone that I told you that."

155. GREENE also contacted BRIGHTPOINT'S compliance hotline that same day. GREENE felt more comfortable reporting these issues to compliance personnel because BRIGHTPOINT staff told her that the compliance line was operated by a third- party. However, shortly after making her complaint to what she believed to be third-party compliance personnel, that complaint was forwarded by compliance staff to Gil Rosen—a compliance officer directly employed by BRIGHTPOINT.

156. On April 22, 2019, Mr. Ramjohn scheduled a meeting between GREENE and Gil

Rosen, John Schelvin (BRIGHTPOINT - Vice President of the Health Home Program), and Greg Gast (BRIGHTPOINT - Vice President of Human Resources for Hudson Health) to occur the next day.

157.    This meeting was scheduled for the same day as training that GREENE had with colleagues. What's more, the meeting was conducted in the open in BRIGHTPOINT'S call-center-style offices. This setting effectively prevented GREENE from being able to raise her concerns with the privacy necessary to address the issues appropriately.

158.    Ultimately, BRIGHTPOINT placed GREENE on administrative leave that day. GREENE was then terminated thirty days later without any legitimate reason.


## COUNT I

### FCA VIOLATION
### (31 U.S.C. §§ 3730(h))

159.    GREENE realleges the above allegations as if set forth fully herein.

160.    GREENE was suspended and subsequently discharged because of her lawful acts done in furtherance of her efforts to stop BRIGHTPOINT's fraudulent conduct set forth above.

## COUNT II

### New York False Claims Act Violations
### (N.Y. Fin. Law § 191)

161.    GREENE realleges the above allegations as if set forth fully herein.

162.    GREENE was suspended and subsequently discharged because of her lawful acts done in furtherance of her efforts to stop BRIGHTPOINT's fraudulent conduct set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, demands judgment against BRIGHTPOINT as follows:

A.      On Count I:

       1.      A money judgment against BRIGHTPOINT, in favor of GREENE, that equals two times the amount of back pay; interest on the back pay; and compensation for any and all special damages sustained.

B.      On Count II:

       1.      A money judgment against BRIGHTPOINT, in favor of GREENE, that equals all relief necessary to make GREENE whole, including, but not limited to, hiring or reinstatement to the position such person would have had but for the discrimination or to an equivalent position; reinstatement of full fringe benefits and seniority rights; payment of two times backpay, plus interest; and compensation for any special damages sustained as a result of the discrimination including litigation costs and reasonable attorneys' fees.

C.      Awarding GREENE all reasonable expenses that were necessarily incurred in

prosecution of this action , plus all reasonable attorneys' fees and costs, as provided by the FCA and

NYFCA;

D.      Interest on money judgments, as provided by law; and

E.      For such other relief for Plaintiff as the Court deems appropriate

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Greene hereby demands trial by jury.

` ` ` ` ` ` ` ` ` ` ` `Dated:   New York, New York
              March 23, 2023

                       BRUSTEIN LAW PLLC

                       By:     *Isl*
                       Evan Brustein, Esq.
                       299 Broadway, 17th Floor
                       New York, New York 10007
                       (212) 233-3900
                       evan@brusteinlaw.com

                       RISMAN & RISMAN, P.C.
                       Maya Risman, Esq.

299 Broadway – 17th Floor
New York, New York 10280
(212) 233-6400
mrisman@risman-law.com

*ATTORNEYS FOR PLAINTIFF*